**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION**

| | | |
|---|---|---|
| DAVID BOY FULLER, | ) | |
| AIS # 147862, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 09-00839-WS-N |
| | ) | |
| Dr. TESEMMA, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff, an Alabama prison inmate proceeding *pro se* and *in forma pauperis* filed a complaint under 42 U.S.C. § 1983. This action was referred to the undersigned pursuant to 28 U.S.C. § 636(b)(1)(B) and Local Rule 72.2(c)(4), and is now before the undersigned on the motion for summary judgment of Defendants (doc. 69), and Plaintiff's responses thereto (docs. 74, 77, 91). For the reasons stated below, it is recommended that the motion for summary judgment of Defendants be granted. Additionally, it is recommended that all claims against the unserved and non-appearing defendants be dismissed, as frivolous or because the plaintiff has failed to state a claim on which relief may be granted against those defendants, pursuant to 28 U.S.C. § 1915(e)(2)(B), as their claims are the same or similar to served defendants against whom claims for relief could not be stated.

## I.  <u>Applicable Factual Background</u>

Plaintiff was incarcerated at Holman Correctional Facility ("Holman") at the time his claim arose. (Doc. 40 at 4; Doc. 67-1 at 2-3). He has numerous health

issues, including obesity, high blood pressure, hemorrhoids, gastrointestinal problems, mental health issues, and recurrent bouts of athletes foot and nail fungus (see exhibits attached to docs. 67, 81); however, this action focuses primarily on his diabetic risk and treatment, his failure to be treated after a specific head injury, and the failure of certain nursing staff to cut his toenails on particular occasions. (Doc. 40 at 5-6, 8-12). From its review of the record, the Court summarizes the parties' allegations which are material to the issues addressed in this Report and Recommendation.[1]

Beginning on October 31, 2007, Dr. Barnes, Plaintiff's original treating physician at Holman, ordered twice daily blood sugar checks for one month to monitor Plaintiff for diabetes. (Doc. 81-3 at 45). Despite normal A1C[2] and glucose blood test results following the month of observation (doc. 81-3 at 111-112), Dr. Barnes continued twice daily blood sugar checks on him from February 2008 through July 2008[3] given Plaintiff's increased risk factors of obesity, lack of

---

[1]    The "facts, as accepted at the summary judgment stage of the proceedings, may not be the actual facts of the case." Priester v. City of Riviera Beach, Fla, 208 F.3d 919, 925 n.3 (11th Cir. 2000)(citations and internal quotation marks omitted). Nevertheless, for summary judgment purposes, the Court's analysis begins with a description of the facts in the light most favorable to the nonmoving party. See McCullough v. Antolini, 559 F.3d 1201, 1202 (11th Cir. 2009).

[2]    The A1C [glycated hemoglobin] test is a "blood test [that] indicates your average blood sugar level for the past two to three months. It measures the percentage of blood sugar attached to hemoglobin, the oxygen-carrying protein in red blood cells. The higher your blood sugar levels, the more hemoglobin you'll have with sugar attached. An A1C level of 6.5 percent or higher on two separate tests indicates that you have diabetes." http://www.mayoclinic.com/health/diabetes/DS01121/DSECTION=tests-and-diagnosis (last visited on October 23, 2013.

[3]    In February 2008, Plaintiff's daily blood checks were within normal ranges

exercise, and his continued complaints. Dr. Barnes also placed Plaintiff on several low calorie diets to help control his risk for developing diabetes (doc. 81-4 at 8-11; doc. 81-7 at 50, 53) and continued to run periodic A1C and glucose blood tests on Plaintiff that sustained results within the normal to pre-diabetic ranges. (Doc. 81-3 at 23, 28, 105; Doc. 81-6 at 8, 10; Doc. 81-8 at 8, 36-39). After an A1C test in December 2008, however, revealed results closer to the diabetic diagnosis threshold, Dr. Barnes reinstituted daily blood sugar checks from January through March 2009,[4] but Plaintiff's results were always within normal ranges and never indicated a need for glucose to be administered. (Doc. 81-8 at 33-35). On March 7, 2009, Plaintiff received an A1C test result of 6.8 percent. (Doc. 81-7 at 36). Following this test, Plaintiff was prescribed another low calorie diet, allowed to come to the health care unit and have his blood sugar checked whenever he requested (doc. 81-6 at 125; doc. 81-8 at 32), but his "diabetic finger-sticking card" was discontinued on June 25, 2009.[5] (Doc. 74 at 7-9). On July 8, 2009, Plaintiff refused to have an A1C

---

and no glucose was ever administered. (Doc. 81-3 at 28). In March 2008, Plaintiff received glucose on four mornings when he awoke with low blood sugar. (Id. at 23). In April 2008, Plaintiff again received glucose on four mornings when his results were low. (Doc. 81-8 at 39). However, in May 2008, Plaintiff refused the blood sugar checks offered by the staff 11 times, and he never needed any glucose (doc. 81-8 at 38), in June 2008 he refused to be checked 18 times and never required glucose to be administered (id. at 37), and in July 2008 he refused to be checked 10 times and glucose was never needed (id. at 36).

[4]     In January 2009, Plaintiff refused 15 blood sugar checks in 23 days (doc. 81-8 at 35), in February 2009 he refused 21 times (id. at 34), and in March 2009 he refused 6 times in 10 days (id. at 33).

[5]     Plaintiff claims in his proposed amended complaint that on June 25, 2009, he was seen in the infirmary to have his feet soaked, when Defendant Nettles stated, she

didn't do feet and the other nurses don't do feet either. Nurse Turner then

retest (81-6 at 23), but did subsequently undergo an A1C and a glucose test in late July 2009, and received results within the pre-diabetic and normal range, respectively. (Doc. 81-8 at 45).

In August 2009, Defendant Dr. Tesemma became the physician at Holman (doc. 40 at 4-5) and treated Plaintiff for complaints of leg pain,[6] foot pain,[7] and blood sugar. (Doc. 74 at 12). In December 2009, after complaints regarding Plaintiff's blood sugar, Dr. Tesemma ordered that Plaintiff receive a blood workup before his next doctor's appointment (doc. 74 at 12; doc. 91 at 44), at which time, Plaintiff's A1C results were calculated at 6.3 percent. (Doc. 67-3 at 71; Doc. 74 at 15; Doc. 91

---

chimed in saying I could fake any kind of illness I wanted to. What makes him different from everybody else. When there are 700 inmates whose feet we'll have to soak at that rate. And he ain't no diabetic. Then she said she was going to see if I was a diabetic.

(Doc. 37 at 4). Later that same night, Defendant Sergeant Adams, upon direction from Defendant Nurse Vaczy, confiscated his diabetic card. (Id.).

Plaintiff's allegation and explanation of the same situation is slightly different in his response to Defendants' motion for summary judgment where he claims that on June 25, 2009, at approximately 3:00 a.m., he notified Sergeant Adams of blood in his stool; Sergeant Adams contacted the infirmary for treatment and Defendant Nurse Vaczy refused to see Plaintiff but requested, per doctor's orders, that Sergeant Adams "pull [his] diabetic finger sticking card." (Doc. 74 at 7-8). Plaintiff filed a grievance regarding the incident and the response indicated that Plaintiff had a negative occult blood test, but Defendant Dr. Barnes was scheduling him an appointment with a free world doctor regarding the rectal bleeding. (Id. at 8). The response also confirmed that the doctor ordered Plaintiff's diabetic card be pulled. (Id.).

[6]    In December of 2009, Dr. Tesemma ordered a knee brace for Plaintiff after presented with complaints. (Doc. 67-3 at 92). In January of 2010, an x-ray of Plaintiff's knee was conducted after he again complained of leg pain, but no effusion, swelling, or edema was found. (Doc. 67-3 at 29).

[7]    After complaints of foot pain, Dr. Tesemma ordered that Plaintiff's toenails be clipped and placed a standing order that his feet be soaked and toenails clipped every three months for a year. (Doc. 67-3 at 56; Doc. 91 at 34).

at 44).

Thereafter, on January 31, 2010, Plaintiff had a panic attack and fell. (Doc. 67-3 at 51). As a result of the fall, Plaintiff received a knot over his right eye. (Id. at 49). He submitted a sick call request to have the wound evaluated; the request was stamped as received on February 2, 2010, and he was examined that same day. (Id. at 51). Although Plaintiff requested an x-ray, it was not conducted since Plaintiff had no complaints of changes in his vision nor swelling to his eye or the surrounding area, but he was given Tylenol for any pain symptoms and his chart was forwarded to the physician for review. (Id. at 46-50). Plaintiff was reexamined on February 13, 2010 with the same complaint, but, again, "no injuries [were] noted at right eye." (Id. at 47). The nursing staff, however, refilled Plaintiff's pain medication and made him an appointment for February 26, 2010 with Dr. Tesemma. (Id.). During the February 26, 2010, examination, an x-ray was ordered of Plaintiff's facial bones that revealed all were intact and there was no injury. (Id. at 78).

An evaluation of Plaintiff's diabetic risk was again conducted on March 4, 2010, with another A1C blood test, which reported levels of 6.5 percent. (Doc. 67-3 at 67).

On April 1, 2010, Plaintiff submitted a sick call request complaining of pain in his feet and requesting his toenails be soaked and cut but then refused the scheduled appointment. (Doc. 67-3 at 39-40). On April 3, 2010, Plaintiff had his toes wrapped after he hit them on a door and an appointment was made for him to

be evaluated by the doctor. (Doc. 67-3 at 38). When he was examined on April 5, 2010, Dr. Tesemma ordered a x-ray of Plaintiff's foot (which revealed no fracture or destructive process) (doc. 67-3 at 77) and that his toenails be clipped every three months (but the orders indicated "No Soak[ing]" of his feet) (doc. 67-3 at 81). Plaintiff's toenails were subsequently clipped on April 12, 2010. (Doc. 67-3 at 81).

Plaintiff was transferred from Holman to Donaldson Correctional Facility ("Donaldson") on April 15, 2010;[8] his transfer sheet included orders for blood pressure checks, a mental health checkup, and a 1000-calorie diet. (Doc. 67-3 at 34). An A1C test was performed on April 27, 2010, and confirmed an A1C result of 6.8 percent (doc. 67-3 at 65), and urinalysis results on June 22, 2010, showed elevated glucose levels (doc. 67-4 at 111). It was not until August 3, 2010, when Plaintiff's lab work detected an A1C level of 8.1 percent that Plaintiff first received a formal diagnosis of diabetes, was placed on a 2200-calorie diet with no PM snack, and began taking Glucophage, a first line drug for Type II, non-insulin dependent diabetes. (Doc. 67-3 at 3, 108).

## II.    Applicable Procedural Background

Plaintiff filed his original § 1983 complaint on December 30, 2009, naming 27 defendants. (Doc. 1). He subsequently filed an amended complaint and a motion to dismiss several claims and defendants from the action, which the Court granted. (Docs. 9, 10, 11). Plaintiff filed a second amended complaint on April 13, 2010 (doc.

---

[8]    Plaintiff returned to Holman in January 2011 (doc. 28) and remained there until August 2011 when he was transferred to another state prison. (Doc. 39).

12), and his third amended complaint was a handwritten narrative (doc. 37), which the Court ordered him to refile on the Court's § 1983 form. (Doc. 38).

On August 22, 2011, Plaintiff filed his fourth and final complaint in compliance with the Court's order, naming the following 15 defendants: 1) Dr. Nagash Tesemma, 2) Nurse Sylvia Hicks, 3) Nurse Lisa Taylor, 4) Nurse Hardly, 5) Nurse Booker, 6) Nurse Bridgette Wilson, 7) Nurse Langford, 8) Nurse Christina Stabler, 9) Nurse Harris, 10) Nurse Rachael Carnley, 11) Nurse Renee Nettles, 12) Nurse Denise Turner, 13) Nurse Tammy Vaczy, 14) Sergeant Adams, 15) Ruth Naglich. [9] (Doc. 40). On December 21, 2011 the Court ordered that this complaint superseded "all prior complaints" (docs. 40-41), and eight defendants, Dr. Barnes, [10] Dr. Tesemma, Nurse Carnley, Nurse Nettles, Nurse Stabler, Nurse Taylor, Nurse Wilson, and Nurse Vaczy, answered Plaintiff's complaint and filed a special report on February 1, 2013. [11] (Docs. 58, 67). Approximately 400 pages of medical records

---

[9] Plaintiff stated in his original complaint that he was suing each defendant in his or her individual and official capacity (doc. 1 at 1); however, he neglects to stipulate this in his final amended complaint. (See Doc. 40). Furthermore, Plaintiff's previous complaints demand punitive damages in the amount of $50,000 from each nurse and $10,000 in compensatory damages, $25,000 in punitive damages and $5,000 compensatory damages from Defendant Naglich, and a declaratory judgment that medical treatment and nursing protocol be monitored and enforced, and states no relief from the names doctors (see Doc. 12 at 15; Doc. 37 at 8), but his final complaint seeks no relief from any defendant (see doc. 40 at 7). Having found no constitutional violation in this action, it is unnecessary to address whether Plaintiff has properly raised a claim for money damages or to analyze what relief Plaintiff has properly pleaded.

[10] While Plaintiff included Dr. Barnes as a defendant in his original complaints (see docs. 1, 9, 12, and 37), he failed to name Dr. Barnes as a defendant in his final amended complaint (see doc. 40). Despite this oversight, Dr. Barnes did answer Plaintiff's suit (docs. 58, 67).

[11] Of the fifteen defendants named in the operative complaint (Doc. 40), waivers

were submitted by the parties, but there were no records dated prior to June 19, 2009 (see doc. 67-3); accordingly, the Court ordered Defendants to produce any and all medical records pertaining to Plaintiff that were in the custody of the Alabama Department of Corrections. (Doc. 79). Over 900 additional pages of medical records

---

of service were not received from the following: Nurse Hicks, Nurse Hardly, Nurse Booker, Nurse Langford, Nurse Harris, Nurse Turner, Sergeant Adams, and Ruth Naglich. The plaintiff moved for default judgment against all of these except Nurse Turner. (*See* Docs. 61, 68; see also Docs. 84, 85 (endorsed order denying motions for default judgment).) Pursuant to this Court's Standing Order No. 17, if waivers are not returned, the Court, like other district courts, may then employ the United States Marshal to effect service, provided the plaintiff has given the Court sufficient current address information for the non-waiving defendants. *See id.*, ¶ 5(b); *see also generally Grady v. Lopez*, No. 406CV151, 2007 WL 1238535 (S.D. Ga. Apr. 25, 2007).

As to facts related to all allegations against the unserved non-waiving defendants, the record reviewed by the undersigned clearly shows that the plaintiff's case against all these defendants is frivolous. As such, service is of no concern, because the Court is required to dismiss pursuant to 28 U.S.C. § 1915(e)(2)(B). *See, e.g., Edmon v. Chaney*, 160 Fed. App'x 437, 438-39 (5th Cir. Jan. 5, 2006) (per curiam) ("A district court **must** dismiss a complaint that it determines to be frivolous. 28 U.S.C. § 1915(e)(2)(B)(i). **Service** upon the defendants **prior to such a dismissal is not required**. *See id.* Thus, Edmon's claim that the unserved defendants should have been ordered to answer his complaint and provide discovery is frivolous." (emphasis added)); *Poole v. Streiff*, Civil Action No. 07-0749-KD-C, 2008 WL 2699420, at *1 n.2 (S.D. Ala. June 30, 2008) ("Two additional Defendants, Tony Buford and Perry County Correctional Officer Sgt. A. Conner, have not yet been served in this action. However, Plaintiff's claims against Defendants Buford and Conner fail to state a claim and are due to be dismissed."); *Moore-Bey v. Cohn*, 69 Fed. App'x 784, 787-88 (7th Cir. June 25, 2003) (per curiam) ("That leaves only the defendants who were never served. In its final order terminating the case, the district court did not explain its rationale for dismissing the three unserved defendants. **But we are confident that the court, after having reviewed Moore-Bey's evidence as to the served defendants, carried out its statutory mandate to dismiss a complaint whenever it becomes apparent to the court that no claim for relief is stated or the case is frivolous**[, pursuant to § 1915(e)(2)(B).]" (collecting authority and emphasis added)); *accord Lewal v. Wiley*, 29 Fed. App'x 26, 28-29 & n.2 (2d Cir. Jan. 4, 2002) (per curiam); *Beecher v. Jones*, No. 3:08cv416/MCR/EMT, 2010 WL 5058555, at *6 (N.D. Fla. Oct. 29, 2010), *report and recommendation adopted*, 2010 WL 5055991 (N.D. Fla. Dec. 6, 2010); *see also Sine v. Pandya*, No. 1:12cv344, 2013 WL 3729695, at *5 (W.D. Mich. July 15, 2013) ("[D]efendant Hammond has not been served with a summons and complaint in this matter. Nevertheless, under the circumstances of this case, defendant Hammond should be granted summary judgment on the same grounds as the movants." (collecting authority)).

were subsequently produced (doc. 81) and reviewed by the Court, and Defendants' Answer was converted to a motion for summary judgment. (Doc. 69). Defendants' motion for summary judgment and Plaintiff's responses thereto (docs. 74, 77, 91) are now before the Court.

### III. Summary Judgment Standard

In analyzing the propriety of a motion for summary judgment, the Court begins with these basic principles. The Federal Rules of Civil Procedure grant this Court authority under Rule 56 to render "judgment as a matter of law" to a party who moves for summary judgment. Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986), the Supreme Court held that summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact. . . ." However, all of the evidence and factual inferences reasonably drawn from the evidence must be viewed in the light most favorable to the nonmoving party. Adickes v. S.H. Kress & Co., 398 U.S. 144, 157 (1970); Jackson v. BellSouth Telecomms., 372 F.3d 1250, 1280 (11th Cir. 2004).

The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions

on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." <u>Celotex</u>, 477 U.S. at 323. The movant can meet this burden by presenting evidence showing there is no dispute of material fact or by pointing out to the district court that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. <u>Id</u>. at 322-25.

Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact. <u>See Stabler v. Fla. Van Lines, Inc.</u>, No. 11-0103-WS-N, 2012 WL 32660, *5 (S.D. Ala. Jan. 6, 2012) (citing <u>Clark v. Coats & Clark, Inc.</u>, 929 F.2d 604, 608 (11th Cir. 1991)). Summary judgment is proper when, "after an adequate time for discovery, a party fails to make a showing sufficient to establish the existence of an essential element of that party's case." <u>McDowell v. Brown</u>, 392 F.3d 1283, 1288 (11th Cir. 2004) (citations and internal quotation marks omitted). "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party. . . . If the evidence is merely colorable, . . . or is not significantly probative, . . . summary judgment may be granted." <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 249-50 (1986) (internal citations omitted). "After the nonmoving party has responded to the motion for summary judgment, the court must grant summary judgment if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law." <u>AGSouth Genetics, LLC v. Cunningham</u>, No. 09-745-C, 2011 WL 1833016, *2 (S.D. Ala. May 13, 2011).

## IV.    Discussion

Plaintiff alleges cruel and unusual punishments by multiple defendants while housed at Holman for denials of medical treatment. (Doc. 40 at 4; Doc. 74 at 4). The Court will review each of Plaintiff's claims in turn.

### A.    Eighth Amendment Denial of Medical Care

The Eighth Amendment provides that, "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII. "The Eighth Amendment's proscription of cruel and unusual punishments prohibits prison officials from exhibiting deliberate indifference to prisoners' serious medical needs." Campbell v. Sikes, 169 F.3d 1353, 1363 (11th Cir. 1999) (citing Estelle v. Gamble, 429 U.S. 97, 104 (1976)). In Sims v. Mashburn, 25 F.3d 980 (11th Cir. 1994), the Eleventh Circuit delineated the objective and subjective portions of an Eighth Amendment claim as follows:

> An Eighth Amendment claim is said to have two components, an objective component, which inquires whether the alleged wrongdoing was objectively harmful enough to establish a constitutional violation, and a subjective component, which inquires whether the officials acted with a sufficiently culpable state of mind.

Sims, 25 F.3d at 983 (citing Hudson v. McMillian, 503 U.S. 1, 8 (1992)). To meet the objective element required to demonstrate a denial of medical care in violation of the Eighth Amendment, a plaintiff first must demonstrate the existence of an "objectively serious medical need." Farrow v. West, 320 F.3d 1235, 1243 (11th Cir. 2003). A serious medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily

recognize the necessity for a doctor's attention.'" Id. (quoting Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994), overruled in part on other grounds by Hope v. Pelzer, 536 U.S. 730, 739 n. 9 (2002)). "In either of these situations, the medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." Id. (internal quotation marks and citation omitted).

In order to meet the subjective requirement of an Eighth Amendment denial of medical care claim, Plaintiff must demonstrate "deliberate indifference" to a serious medical need. Farrow, 320 F.3d at 1243. "Deliberate indifference" entails more than mere negligence. Estelle, 429 U.S. at 106; Farmer v. Brennan, 511 U.S. 825, 835 (1994).

> The Supreme Court clarified the "deliberate indifference" standard in *Farmer* by holding that a prison official cannot be found deliberately indifferent under the Eighth Amendment "unless the official *knows of* and *disregards an excessive risk to inmate health or safety;* the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 837, 114 S. Ct. 1970 (emphasis added). In interpreting *Farmer* and *Estelle,* this Court explained in *McElligott* that "deliberate indifference has three components: (1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than mere negligence." *McElligott,* 182 F.3d at 1255; *Taylor,* 221 F.3d at 1258 (stating that defendant must have subjective awareness of an "objectively serious need" and that his response must constitute "an objectively insufficient response to that need").

Farrow, 320 F.3d at 1245-46.

## 1. Failure of Doctors to Provide Adequate Medical Treatment for Diabetes

Plaintiff alleges Dr. Barnes is liable in the event he treated Plaintiff for

diabetes if he was not a diabetic (doc. 74 at 2) and Dr. Tesemma for failing to treat him for diabetes (id. at 3). However, Plaintiff fails to carry his burden of proving there is a genuine issue as to any material fact for trial on the part of either doctor.

From a review of the record, it appears that Dr. Barnes properly treated Plaintiff while he was at Holman. Specifically, there is no evidence that Dr. Barnes was deliberately indifferent to Plaintiff's medical needs. Furthermore, there is no evidence that Dr. Barnes ever formally diagnosed Plaintiff as having the disease of diabetes. There is firm evidence, however, that Dr. Barnes closely monitored Plaintiff for developing diabetes given his known risk factors of obesity, family history, race, and sedentary lifestyle. (Doc. 81-3 at 71). For instance, Dr. Barnes not only periodically ordered laboratory blood tests for Plaintiff to determine if he was diabetic, he also monitored Plaintiff more closely with daily blood sugar checks to assess any blood sugar problems (doc. 81-3 at 23, 28, 50, 53, 111-112; doc. 81-8 at 33-39, 41, 45, 100), and placed Plaintiff on low calorie diets in attempt to prevent the onset of diabetes (doc. 67-3 at 111; doc. 81-4 at 8-11; doc. 81-7 at 50, 53).[12] Only once, on March 7, 2009, did Plaintiff receive an A1C test result greater than 6.5 percent while under the care of Dr. Barnes (doc. 81-7 at 36), and according to the American Diabetes Association, it takes at least two readings of 6.5 percent or higher to formally diagnose one as a diabetic. (See, supra, n. 2).

---

[12]     While under the care of Dr. Barnes from March 2007 through July 2009, Plaintiff received A1C test results of 6.2 percent (doc. 81-3 at 112), 6.0 percent (id. at 105), 6.1 percent (doc. 81-6 at 8), 6.4 percent (doc. 81-5 at 78), 6.4 percent (id. at 83), 6.8 percent (doc. 81-7 at 36), and 6.3 (doc. 81-8 at 45).

The only scintilla of evidence that Plaintiff presents that he may have ever received an actual diagnosis of diabetes is found on one page of a three-page assessment form for diagnosing chest pain complaints. (See Doc. 91 at 19; Doc. 81-4 at 104). In the section identifying risk factors for heart attacks and related conditions, diabetes is checked for Plaintiff on October 6, 2008, after he presented to the health unit with complaints of chest pains. (Doc. 81-4 at 104). However, the listing of this factor is contradicted by the facts that Plaintiff was not receiving daily blood sugar checks at this time, he was not receiving diabetic medication or insulin at this time, and there is no indication of who (doctor, nurse, or Plaintiff) filled out the form. Furthermore, this same chest pain diagnosis form was also used for Plaintiff on June 15, 2009 and July 4, 2009, while Dr. Barnes was still Plaintiff's treating physician, and neither time is Plaintiff listed as being diabetic on the forms. (Doc. 81-6 at 82, 91).

At no time during the years that Dr. Barnes treated Plaintiff did Plaintiff ever have two A1C tests with results of 6.5 percent or higher and only a few times in early 2008 (when glucose was administered for low blood sugar) did Plaintiff ever show signs of any blood sugar issues, despite months of monitoring with twice daily blood sugar checks. By all accounts in the record, Dr. Barnes thoroughly explored options and treatments for Plaintiff for over two years. Thus, Plaintiff has failed to prove that Defendant Dr. Barnes was deliberately indifferent to Plaintiff's prediabetic needs or any medical needs; it also appears that Plaintiff was never officially diagnosed as having the disease of diabetes while under the care of Dr.

Barnes. As such, summary judgment should be entered in favor of Defendant Dr. Barnes, and all claims against Defendant Dr. Barnes should be dismissed.

As to the claims asserted against Dr. Tesemma, Plaintiff alleges that Dr. Tesemma violated his Eighth Amendment rights when he discontinued the diabetes treatment previously ordered by Dr. Barnes and failed to treat Plaintiff for diabetes. (Doc. 40 at 4-5). The medical records establish that Dr. Tesemma[13] was monitoring Plaintiff for developing diabetes, including blood tests, eye exams,[14] and leg and foot care,[15] as well as treating his routine sick call complaints.[16] Although Dr. Barnes

---

[13] Plaintiff insinuates that the distinction of Dr. Tesemma holding a Doctor of Osteopathic Medicine degree ("D.O.") rather than a Doctor of Medicine degree ("M.D.) is the cause of a "wrong diagnosis" or a missed diagnosis of diabetes. (Doc. 77 at 1). However, these two professional titles are simply semantics and do not indicate a lack of medical knowledge or professional training on the part of Defendant Dr. Tesemma.

Holders of a D.O. degree "have the same rights, privileges, and responsibilities as physicians with a Doctor of Medicine degree . . . . Both D.O.'s and M.D.'s are medical doctors and attend 4 years of medical school and now have a merged graduate medical training route. . . D.O.'s as medical doctors hold the same knowledge as M.D.'s but also have been trained extensively (200+ hours) in manipulation medicine (musculoskeletal to be exact, not massage or chiropractic, and not bone doctors, as the osteo might imply), and is just another tool to add if conventional medicine isn't working or warranted. . . . Whether you see a D.O. or an M.D., you are getting the same standard of care plus the added benefit of musculoskeletal treatment if needed. D.O. physicians are licensed to practice the full scope of medicine and surgery in all 50 states, and make up 7 percent of the total U.S. physician population." WIKIPEDIA, http://en.wikipedia.org/wiki/Doctor_of_Osteopathic_Medicine (last visited June 19, 2013).

[14] Plaintiff received eye exams in October and November of 2009, which revealed no indications of diabetes or its progression. (Doc. 67-3 at 59; Doc. 81-7 at 117).

[15] See, *supra*, notes 6-7.

[16] Colonoscopies were performed after complaints of rectal bleeding. (Doc. 67-3. at 27-28, 31, 60, Doc. 67-5 at 38). In February 2010, Plaintiff was seen multiple times for bloody stools. (Doc. 67-3 at 27-28, 42, 44-45, 47). Plaintiff received x-rays, that revealed no abnormalities, after complaints of facial and head pain. (Doc. 67-3 at 78). Plaintiff was treated after presenting with complaints of chest pain, including receiving EKGs (which he refused on occasions (see doc. 67-3 at 42, 88)) and blood pressure monitoring. (Doc. 67-3 at

had already discontinued Plaintiff's diabetic testing card, Dr. Tesemma continued

Dr. Barnes' treatment plan for Plaintiff by prescribing the same low calorie diet,

which is the first step in not only treating Type II diabetes but also reducing one's

chances of ever being diagnosed with Type II diabetes,[17] and ordering periodic A1C

tests, which is the standard test used by many physicians to diagnose diabetes in

patients.[18] While under the care of Dr. Tesemma, Plaintiff received A1C results of

6.3 percent and 6.5 percent on January 27, 2010, and March 4, 2010, respectively.

(Doc. 67-3 at 67, 71). He never received an A1C result of 6.5 percent or higher on

two separate occasions while under the care of Dr. Tesemma. Given the vast

amount of medical care indicated by the submitted records, there is no evidence

that Dr. Tesemma acted with deliberate indifference toward Plaintiff, and any

_____

35, 80; Doc. 81-7 at 78, 81).

[17] A person's risk for developing Type II diabetes may be lowered by "losing weight, eating right, and getting active. . . . [R]esearch has shown that over the long term, healthy lifestyle changes can work better than medicine at reducing your risk of getting type 2 diabetes." WebMD, http://diabetes.webmd.com/guide/prediabetes-treatment-overview (last visited June 19, 2013); see also, American Diabetes Association, Prediabetes FAQs, http://www.diabetes.org/diabetes-basics/prevention/pre-diabetes/pre-diabetes-faqs.html (last visited June 20, 2013) (advising that losing weight can reduce one's risk of developing type 2 diabetes by 50 percent and may return blood glucose levels to the normal range).

[18] The A1C "blood test indicates your average blood sugar level for the past two to three months. It measures the percentage of blood sugar attached to hemoglobin, the oxygen-carrying protein in red blood cells. The higher your blood sugar levels, the more hemoglobin you'll have with sugar attached. " Tests and Diagnosis, Mayo Clinic Staff, http://www.mayoclinic.com/health/diabetes/DS01121/DSECTION=tests-and-diagnosis (last visited June 20, 2013) (hereinafter Mayo Clinic). See also, Diabetes Care, International Expert Committee Rept on the Role of the A1C Assay in the Diagnosis of Diabetes (July 2009), http://www.ncbi.nlm.nih.gov/pmc/articles/PMC2699715/ (hereinafter Diabetic Care) ("The A1C assay is the test of choice for the chronic management of diabetes and is now being recommended for its diagnosis.").

failure to diagnose Plaintiff with diabetes would be negligence at best. See Estelle, 429 U.S. at 106 ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner.").

Furthermore, to succeed in proving that any delay of his diagnoses of diabetes rose to a constitutional violation, Plaintiff "must place verifying medical evidence in the record to establish the detrimental effect of delay in medical treatment to succeed. . . . Consequently, delay in medical treatment must be interpreted in the context of the seriousness of the medical need, deciding whether the delay worsened the medical condition, and considering the reason for delay. Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176 at 1188-89 (11th Cir. 1994) (internal citations omitted) (footnotes omitted); see also, Mann v. Taser Int'l, Inc., 588 F.3d 1291, 1307 (11th Cir. 2009). Plaintiff did not state any worsening of his condition or health from August 2009, when Dr. Tesemma was treating him, through August 2010, when he was diagnosed as a Type II diabetic. Plaintiff was on a low calorie diet while under the care of Dr. Tesemma, and Plaintiff's current diabetic treatment consists of a diet and medication, Glucophage, a first-line drug for Type II diabetes. (Doc. 67 at 5). Plaintiff does not receive insulin. (Id.). There is no evidence that Defendant Dr. Tesemma ever knew of an excessive risk to Plaintiff's health and disregarded it, nor is there "verifying medical evidence" that any delay in Plaintiff's diabetic diagnosis has detrimentally effected his medical

condition.[19] <u>Hill</u>, 40 F.3d at 1188-89. And, whether Plaintiff disagrees with the efficacy of the recommended treatment or simply prefers a different course of treatment, such a complaint does not state a valid claim of medical mistreatment under the Eighth Amendment. <u>See, e.g.</u>, <u>Adams v. Poag</u>, 61 F.3d at 1545; <u>Del Muro v. Fed. Bureau of Prisons</u>, 2004 WL 1542216, *4 (N.D. Tex. 2004) ("[i]t is well-established that a difference in opinion or a disagreement between an inmate and prison officials as to what medical care is appropriate for his particular condition does not state a claim for deliberate indifference to medical needs.").

Plaintiff has failed to establish that Dr. Tessemma acted with deliberate indifference. <u>See</u> <u>Celotex</u>, 477 U.S. at 323 ("The moving party is 'entitled to judgment as a matter of law' because the nonmoving party has failed to make a sufficient showing on an essential element of [his] case with respect to which [he] has the burden of proof."). Plaintiff's evidence supporting his claim is only found in filed grievances and is not colorable so as to create a genuine issue of material fact that must be resolved by the trier of fact. <u>Anderson</u>, 477 U.S. at 249-50. By Plaintiff's failure to demonstrate that there exists a genuine issue of material fact, Plaintiff has failed to establish deliberate indifference, an essential element of his Eighth Amendment claim against Defendant Dr. Tesemma. Accordingly, Defendant

---

[19] Despite being transferred to Donaldson prison and being under the care of another physician, Plaintiff was still not immediately diagnosed with diabetes. In fact, under the new physician's care, Plaintiff received an A1C result of 6.8 percent on April 27, 2010, and he was not listed as a diabetic on the Chronic Disease Flowsheet dated May 11, 2010. (Doc. 67-3 at 30). It was not until August 10, 2010, after Plaintiff received an A1C result of 8.1 percent on August 3, 2010, that the Chronic Disease Flowsheet for Plaintiff reflected a diabetic diagnosis. (<u>Id</u>.)

Dr. Tesemma is due to be granted summary judgment on these claims by Plaintiff.

## 2. Failure of Nursing Staff to Provide Diabetic Treatment

In this action, Plaintiff claims Defendants Booker, Carnley, Hardly, Harris, Hicks, Nettles, Stabler, Taylor, Wilson, and Vaczy previously treated him for diabetes and then refused to provide him diabetic treatment after August 2009. (Doc. 37 a 3). The Court finds no evidence that these defendants are liable for an Eighth Amendment violation. Plaintiff has failed to show any indication of a genuine issue of material fact that defendants were deliberately indifferent to his medical needs.[20] The record is filled with diagnostic A1C, glucose and urine tests that prove Plaintiff did not suffer from diabetes during the times in question. Therefore, defendants had no duty or obligation to provide diabetic treatment to Plaintiff if he was not diagnosed as having diabetes.

It is evidenced by the record that Plaintiff was at a severe risk for developing diabetes and continued to present with blood sugar complaints, and, for these reasons, he was closely monitored and checked for diabetes off and on for approximately a year and a half. However, when all the formal laboratory tests resulted in findings outside the diabetic range and when the daily blood sugar checks did not indicate a conclusion in opposition to the laboratory work, the treating physicians were able to declare that Plaintiff was a prediabetic who should be on a diet and exercise program in attempt to lessen his risk of developing

---

[20] Plaintiff insinuates that the defendants' refusal to treat him was due to his continuance filings of grievances and complaints. (Doc. 37 at 3). This is essentially an allegation of retaliation and will be discussed, *infra*, n. 25.

diabetes. This prediabetic diagnosis is what the defendant nurses followed and is why they discontinued "diabetic treatment" of Plaintiff. Any and all times where a delay in medical treatment was experienced by Plaintiff, it can only be described as negligence, not deliberate indifference. For these reasons, Plaintiff's claim against the nursing staff for failing to provide him with diabetic treatment should be dismissed and summary judgment summary judgment should be granted in favor of Defendants.

### 3.    Failure to Completely Remove Glass from Plaintiff's Eye

Plaintiff alleges that Defendant Harris acted with deliberate indifference when she failed to completely remove glass fragments from his eye. Although, Defendant Harris, has not been served with this action, there is sufficient evidence in the record to determine there is no genuine issue as to any material fact and, as a matter of law, Plaintiff has failed to state a valid claim against Defendant Harris.[21]

The record shows that when Plaintiff presented to the nursing unit on July 14, 2009, after an "[o]fficer hit glass several times [and Plaintiff] got glass in [his] eye" (doc. 81-6 at 74), Defendant Harris flushed both of his eyes and removed a piece of glass from his right eye. (Id. at 75). Following the fragment removal, Plaintiff never complained of redness or pain in his right eye until July 24, 2009,

---

[21]    Again, pursuant to § 1915(e)(2)(B)(ii), this court is required to dismiss a claim against an unserved defendant "if the court determines that . . . the action . . . fails to state a claim on which relief may be granted[.]" *Id.*; *see, e.g., Moore-Bey*, 69 Fed. App'x at 787-88 (expressing its confidence "that the [district] court, after having reviewed Moore-Bey's evidence as to the served defendants, carried out its statutory mandate to dismiss a complaint whenever it becomes apparent to the court that no claim for relief is stated").

when he filed a request to be seen by the medical staff because his right eye was "getting dark." (Id. at 68). He was seen the next day on July 25, 2009, and the nurse noted that Plaintiff's right eye was red, "watery," and he was unable to open and close both eyes. (Id. at 70). The nurse then "[f]lushed [Plaintiff's right] eye and dry yellowish tissue came out." (Id.).

The Court admits that having glass in one's eye is a serious medical condition. However, this claim is one of negligence at best, not deliberate indifference. Estelle, 429 U.S. at 106 (Deliberate indifference entails more than mere negligence); Farmer v. Brennan, 511 U.S. 825, 835 (1994). There are no facts suggesting that Defendant Harris knowingly left pieces of glass in Plaintiff's eye in attempt to risk his health or safety or cause him unnecessary pain. Farmer, 511 U.S. at 837. "When a prison inmate has received medical care, courts hesitate to find an Eighth Amendment violation." Waldrop v. Evans, 871 F.2d 1030, 1035 (11th Cir. 1989).

Furthermore, the nurse's notes indicate that "dry yellowish tissue" was removed on July 25, 2009, not glass. (Doc. 81-6 at 70). However, even if Plaintiff is correct that Nurse Harris failed to remove all glass fragments from his eye on July 14, 2009, there is no evidence in the record that he suffered any detrimental effect due to having remnants of glass (or tissue) removed 11 days later.

> The "seriousness" of an inmate's medical needs also may be decided by reference to the effect of delay in treatment. Where the delay results in an inmate's suffering "a life-long handicap or permanent loss, the medical need is considered serious." An inmate who complains that delay in medical treatment rose to a constitutional violation must place verifying medical evidence in the record to establish the detrimental

> effect of delay in medical treatment to succeed. . . . Consequently, delay
> in medical treatment must be interpreted in the context of the
> seriousness of the medical need, deciding whether the delay worsened
> the medical condition, and considering the reason for delay.

Hill, 40 F.3d at 1188-89 (internal citations omitted) (footnotes omitted); see also,

Townsend v. Jefferson Cnty., 582 F.3d 1252, 1259 (11th Cir. 2009) (Inmate "failed to

provide medical records, expert testimony, or other evidence, other than her own

testimony, that any delay in treatment caused her to suffer any injury."). Thus, as

a matter of law, Plaintiff has failed to state claim against Defendant Harris and

dismissal is appropriate.

### 4. Failure to Give Medication

In addition to Plaintiff's claim that the nursing staff refused to provide him

diabetes treatment, he alleges that on March 25-27, 2010, Defendants Booker and

Carnley refused to give him his "blood medications." (Doc. 37 at 6-7; Doc. 40 at 8,

10). The record illustrates that in March 2010 Plaintiff was prescribed the

following medications: Zocor for cholesterol, Prilosec for heartburn (to be dispensed

twice daily), Zestril for high blood pressure, Lasix for fluid buildup, Dilacor XR for

chest pain and high blood pressure, and Celexa for depression. (Doc. 67-5 at 28).

The Medication Administration Record reveals that Plaintiff received all of his

ordered medications on March 25 and 27, 2010, and on March 26, 2010, he received

the Celexa, Dilacor XR, Zestril, and one dose of Prilosec, but he refused the Lasix,

Zocor, and second Prilosec dose. (Id.). The Court finds that the record blatantly

contradicts Plaintiff's allegation.

Based on the evidence before the Court, it appears the Plaintiff only missed

one dose of medicine for high cholesterol, fluid buildup, and heartburn, and the skipped dosages were due to Plaintiff's refusal, not a denial of treatment by Defendants. Therefore, it is recommended that summary judgment be granted in favor of Defendants Booker[22] and Carnley given that Plaintiff has failed to show there is a genuine issue for trial. Scott v. Harris, 550 U.S. 372, 380 (2007) (When a version of facts are so "blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of facts for purposes of ruling on a motion for summary judgment."); see also, Vicks v. Knight, 380 Fed. Appx. 847, 851 (11th Cir. 2010) (unpublished) ("A party opposing summary judgment may not rest upon the mere allegations or denials in its pleadings. Rather, its responses, either by affidavits or otherwise . . . must set forth specific facts showing that there is a genuine issue for trial. A mere "scintilla" of evidence supporting the opposing party's position will not suffice.) (quoting Walker v. Darby, 911 F.2d 1573, 1576-77 (11th Cir. 1990).

### 5. Failure to Treat Plaintiff's Feet

#### i. Defendants Nurse Nettles and Nurse Turner

Plaintiff alleges that on June 25, 2009, Defendants Nettles and Turner were deliberately indifferent to his request to have his feet soaked and toenails trimmed. (Doc. 37 at 4; Doc. 40 at 10). Plaintiff states that Defendant Nettles and Turner told him he "was not going to get [his] feet soaked. That [he] was not a diabetic and

---

[22] Summary judgment against Defendant Booker, who, again, was not served, is required under 28 U.S.C. § 1915(e)(2)(B)(ii).

[he] wasn't doing nothing but faking illnesses." (Doc. 37 at 4). Taking these claims as true, Plaintiff has still failed to prove a genuine issue of fact for trial. The record confirms that on June 25, 2009, Plaintiff did not suffer from diabetes. Therefore, the Court is not persuaded that a long toenails or even an ingrown toenail is a serious medical need.[23] A serious "medical need must be one that, if left unattended, pos[es] a substantial risk of serious harm." <u>Farrow</u>, 320 F.3d at 1243. F.3d 1176, 1187. Medical treatment that is "so grossly incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness" constitutes deliberate indifference. <u>Rogers v. Evans</u>, 792 F.2d 1052, 1058 (11th Cir.

---

[23] "People with diabetes . . . need to be aggressive in treating and preventing ingrown toenails because they can lead to serious complications, including the risk of losing a limb." http://www.webmd.com/skin-problems-and-treatments/understanding-ingrown-nail-basics (last visited on October 30, 2013). In cases involving diabetics, courts have found toenail conditions to be serious medical need. <u>See</u> <u>Williams v. United States</u>, 747 F.Supp. 967 (S.D.N.Y. 1990) (Diabetic inmate was granted relief after he was forced to have his leg amputated due to the medical staff's failure to treat a foot infection.). However, the courts have typically not found toenail issues to be serious conditions when the level of severity is low. <u>See</u> <u>Snipes v. Detella</u>, 95 F.3d 586, 592 (7th Cir. 1996) (holding that removal of toenail without anesthetic was not deliberate indifference to a serious medical need because the need was not sufficiently serious); <u>Watson v. Weldon</u>, No. 2:99-1006-22, 2000 U.S. Dist. LEXIS 11109 (D.S.C. Jan. 12, 2000) (unpublished) (holding that toenail fungus was not a serious medical condition.); <u>McKaye v. Toombs</u>, 1991 U.S. App. LEXIS 7043; 930 F.2d 919, 1991 WL 54893, **1 (6th Cir. 1991) (unpublished) (holding that loss of a toenail due to lack of treatment for an ingrown toenail was not a serious medical need). As then-Chief Judge Posner has stated:

> Deliberately to ignore a request for medical assistance has long been held to be a form of cruel and unusual punishment . . . but this is provided that the illness or injury for which assistance is sought is sufficiently serious or painful to make the refusal of assistance uncivilized. . . . A prison's medical staff that refuses to dispense bromides for the sniffles or minor aches and pains or a tiny scratch or a mild headache or minor fatigue--the sorts of ailments for which many people who are not in prison do not seek medical attention--does not by its refusal violate the Constitution.

<u>Cooper v. Casey</u>, 97 F.3d 914, 916 (7th Cir. 1996).

1986).  And, while an ingrown nail can progress to an infection,[24] there is no evidence anywhere in the medical records that Plaintiff ever presented with symptoms indicative of such a serious case (*i.e.*, he never filed a request for medical attention regarding his toenails on this day or a grievance for lack of attention following the alleged denial of treatment).[25]

Assuming arguendo that a long or ingrown toenail is a serious medical need, the Court finds no proof that Defendants Nettles and Turner refused Plaintiff medical care constituting deliberate indifference.  Plaintiff has failed show any genuine issue of material fact that Defendants Nettles and Turner had knowledge that serious harm would occur if Plaintiff's toenails were not trimmed immediately; in fact, Plaintiff has failed to prove he suffered any harm at all from not having his toenails soaked and trimmed on June 25, 2009.  See Townsend v. Jefferson Cnty., 582 F.3d 1252, 1259 (11th Cir. 2009).  Mere professional negligence or the breach of the applicable standard of care does not constitute deliberate indifference.  "Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."  Estelle, 419 U.S. at 106.  Additionally, a simple difference in medical judgment does not present a constitutional violation.  Adams v. Poag, 61 F.3d 1537, 1545 (11th Cir. 1995).  For these reasons, it is recommended that this claim be

---

[24]     See     http://www.webmd.com/skin-problems-and-treatments/understanding-ingrown-nail-basics (last visitied on October 30, 2013)

[25]     Plaintiff did request his toenails be soaked and trimmed on April 1, 2010; however, he refused the appointment on April 2, 2010, to have his toenails cut.  (Doc. 67-3 at 39-40).  Furthermore, an order was entered on April 5, 2010, that Plaintiff should have his toenails cut every three months, and his toenails were trimmed on April 12, 2010.  (Id. at 81).

dismissed.

## ii.    Defendant Nurse Langford

Plaintiff claims that in "March 2010, plaintiff received a toe injury and was prescribed treatment [that his bandage be changed daily] and on April 15, 2010 Nurse Langford refused to provide treatment."  (Doc. 40 at 9).  However, the medical records presented in this action reveal a slightly different timeline and facts.[26]  The evidence shows that on April 3, 2010, Plaintiff complained of hitting his toe on a door, had the toe wrapped by nursing staff, and an appointment was made for him to be examined by the doctor.  (Doc. 67-3 at 38).  When seen by the doctor on April 5, 2010, orders were entered for an x-ray of Plaintiff's foot to be conducted (which revealed no fracture or injury) and that his toenails be clipped every three months, but without soakings.  (Id. at 77, 81).  Plaintiff's toenails were clipped on April 12, 2010, (id. at 81), and Plaintiff was transferred from Holman on April 15, 2010.  (Id. at 33-34).

The doctor's orders from April 3, 2010, the date of injury, nor the intra-system transfer medical screening form dated April 14 and 15, 2010, identify a standing order to have Plaintiff's bandage changed daily as Plaintiff claims.  (See

---

[26]    When a party tells a story "which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of facts for purposes of ruling on a motion for summary judgment."  Scott v. Harris, 550 U.S. 372, 380 (2007); see also, Vicks v. Knight, 380 Fed. Appx. 847, 851 (11th Cir. 2010) (unpublished) ("A party opposing summary judgment may not rest upon the mere allegations or denials in its pleadings. Rather, its responses, either by affidavits or otherwise . . . must set forth specific facts showing that there is a genuine issue for trial. A mere "scintilla" of evidence supporting the opposing party's position will not suffice.) (quoting Walker v. Darby, 911 F.2d 1573, 1576-77 (11th Cir. 1990).

Doc. 67-3 at 34, 81). Furthermore, the intake nurse at the receiving prison did not note a need to change Plaintiff's bandage. (See Id. at 33). Therefore, the Court concludes, taking Plaintiff's allegation as true, that Defendant Langford was not deliberately indifferent to Plaintiff's medical needs. If the injury and need to change the bandage to Plaintiff's toe was so minor that even the nursing staff at the transfer prison did not take notice of it, it can hardly be considered a serious medical condition in need of treatment. A serious medical need is "'one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'" Farrow, 320 F.3d at 1243 (quoting Hill v. Dekalb Reg'l Youth Det. Ctr., 40 F.3d 1176, 1187 (11th Cir. 1994), overruled in part on other grounds by Hope v. Pelzer, 536 U.S. 730, 739 n. 9 (2002)). Additionally, there are no subsequent grievances or request for medical attention in the record of that would indicate any detrimental harm was caused to Plaintiff by the failure to have his bandage changed on April 15, 2010, before he was transferred from Holman. See Townsend v. Jefferson Cnty., 582 F.3d 1252, 1259 (11th Cir. 2009). Whether or not Defendant Langford has been properly served is a moot point; this claim fails as a matter of law. The Court recommends the claim be dismissed for failure to state a claim upon which relief may be granted. Cf. 28 U.S.C. § 1915(e)(2)(B)(ii).

## B. Eighth Amendment Retaliation Claim

Plaintiff claims Defendant Dr. Tesemma and Nurses Hicks and Taylor failed to provide him medical treatment in retaliation for his filing of past grievances.

"The First Amendment protects inmates from retaliation by prison officials for filing lawsuits or administrative grievances." Redd v. Conway, 2005 WL 3528932, *4 (11th Cir. 2005) (citing Wright v. Newsome, 795 F.2d 964, 968 (11th Cir. 1986); Mitchell v. Farcass, 112 F.3d 1483, 1490 (11th Cir. 1997)). "To state a [F]irst [A]mendment claim for retaliation, a prisoner need not allege violation of a separate and distinct constitutional right." Thomas v. Evans, 880 F.2d 1235, 1242 (11th Cir. 1989). Rather, "[t]he gist of a retaliation claim is that a prisoner is penalized for exercising the right of free speech ." Id.

"To state a retaliation claim cognizable under § 1983, a prisoner must demonstrate that (i) he engaged in a constitutionally protected activity, (ii) he suffered adverse treatment simultaneously with or subsequent to such activity, and (iii) a causal connection existed between the protected activity and the adverse action." Flynn v. Scott, 2006 WL 1236718, *5 (M.D. Ala. 2006) (citing Donnellon v. Fruehauf Corp., 794 F.2d 598, 600-01 (11th Cir. 1986); Farrow v. West, 320 F.3d 1235, 1248 (11th Cir. 2003)).

> An inmate has the initial burden of establishing a prima facie case of unlawful retaliation by a preponderance of the evidence, which once established raises a presumption that prison officials retaliated against the inmate. . . . Merely alleging the ultimate fact of retaliation, however, is insufficient. . . . Additionally, conclusory allegations are insufficient to demonstrate the existence of each element requisite to demonstration of a retaliation claim. . . . If an inmate establishes a prima facie case, the burden then shifts to prison officials to rebut the presumption by producing sufficient evidence to raise a genuine issue of fact as to whether the prison official retaliated against the inmate. This may be done by the prison official articulating a legitimate, non-retaliatory reason for the adverse decision or action, which is clear, reasonably specific and worthy of credence. The prison official has a burden of production, not of persuasion, and thus does not

have to persuade a court that he or she actually was motivated by the reason advanced. . . . Once the prison official satisfies this burden of production, the inmate then has the burden of persuading the court by sufficient evidence that the proffered reason for the adverse decision is a pretext for retaliation.

Flynn, 2006 WL 1236718 at 5-6 (citations omitted). A prisoner "must allege facts showing that the allegedly retaliatory conduct would not have occurred but for the retaliatory motive." Hempstead v. Carter, 2006 WL 2092383, *5-6 (N.D. Fla. 2006) (emphasis added) (citing Jackson v. Fair, 846 F.2d 811, 820 (1st Cir. 1988)). "[A] causal connection may be alleged by a chronology of events that create a plausible inference of retaliation. Id. (citing Cain v. Lane, 857 F.2d 1139, 1143 n. 6 (7th Cir. 1988)). However, "[t]he relevant showing . . . must be more than the prisoner's 'personal belief that he is the victim of retaliation.'" Id. (citing Johnson v. Rodriguez, 110 F.3d 299, 310 (5th Cir. 1997)).

Based on the evidence submitted to the Court, Defendant Dr. Tesemma did not provide daily diabetic treatment to Plaintiff because Dr. Barnes had previously discontinued Plaintiff's diabetic card authorizing treatment and Plaintiff's periodic blood work showed no diagnosis of diabetes. Plaintiff has failed to show a causal connection to the medical care provided by Dr. Tesemma and any filed grievances.

Plaintiff claims that (1) prior to August 2009, Defendant Taylor and Hicks administered glucose to Plaintiff in attempt to lower his blood sugar level, and after August 2009, they refused diabetic treatment due to retaliation; (2) on May 4, 2009, Defendant Taylor refused to treat his swollen feet due to complaints he previously filed against her. (Doc. 74 at 2). Plaintiff's first retaliation claim is similar to that

against Defendant Dr. Tesemma, as is the Court's reasoning for denying the claim. Nurses Taylor and Hicks did not provide diabetic care to Plaintiff after August 2009 because the doctor ordered that his diabetic card be discontinued. There is no evidence submitted by Plaintiff or Defendants specifying an actual diabetic diagnosis ever existing during the period in question; rather, there are only daily blood sugar checks apparently used for monitoring Plaintiff's prediabetic condition, as well as A1C, glucose, and urine test results that prove Plaintiff's condition was not severe enough to receive a diabetic diagnosis. Most importantly, Plaintiff needs more than his belief that Defendants acted in retaliation, Johnson, 110 F.3d at 310, he must present proof, and Plaintiff fails to put forth evidence of a grievance filed or complaint written that proves a causal connection to any denial of treatment. Jackson, 846 F.2d at 820. Therefore, Plaintiff has failed to state a valid claim for retaliation and this claim should be dismissed.

As to Plaintiff's second retaliation claim, there are no records relating to this May 4, 2009 incident. Plaintiff has done no more than put forth a conclusory statement of retaliation. No record of a grievance or complaint against Defendant Taylor was submitted. No record of Plaintiff's request or need for treatment and subsequent denial thereof was submitted. Therefore, as discussed above, Plaintiff fails to prove the essential elements needed to establish a prima facie case of retaliation, and his claim should be dismissed.[27]

---

[27]    One of Plaintiff's amended complaints alludes to a retaliation claim made against Defendants Booker, Carnley, Hardly, Harris, Hicks, Nettles, Stabler, Taylor, Wilson, and Vaczy for failing to provide diabetic treatment to him after August 2009

## C. Eighth Amendment Violation for Interfering with Medical Treatment

Plaintiff claims that Sergeant Adams interfered with his medical treatment when he confiscated Plaintiff's "diabetic card" on June 25, 2009, thereby preventing Plaintiff from receiving further diabetic care. (Doc. 40 at 11). Defendant Sergeant Adams has yet to be served with Plaintiff's complaint, but there is sufficient evidence in the record for the Court to determine that Plaintiff has failed to state a sufficient claim against Defendant Sergeant Adams, and, therefore, there is no need to execute service on Sergeant Adams. *See supra* footnote 11.

Deliberate indifference can be manifested "by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed." Estelle, 429 U.S. at 104-105. "[A]bsent a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner, a non-medical prison official . . . will not be chargeable

---

because of grievances and complaints he had filed against them. (Doc. 37 at 3). Plaintiff states that these nurses

> had an axe to grind with [him] because they knew [he] didn't appreciate their inadequate medical treatment. They knew that [he would file a grievance to Mr. Myers or to Mrs. Ruth Naglich, the regional coordinator in a heartbeat. And they knew [he] would take [his] complaints to the Prison Commissioner Mr. Richard Allen. Not to mention the Warden and Deputy Warden. So they would in turn retaliate against by denying [his] medication, denying [him] adequate medical treatment and being very courteous to [him].

(Id.). If Plaintiff intended to state a retaliation claim against these defendants based on this statement, he has failed to prove it. (Id.). To prove a claim of retaliation, Plaintiff must produce some casual connection between any filed grievance, letter to a supervisor, general complaint or any other act of freedom of speech and the denial of medical treatment or mistreatment by the nursing staff. Flynn, 2006 WL 1236718 at 5-6. Therefore, any claim of retaliation against these defendants should be dismissed.

with the Eighth Amendment scienter requirement of deliberate indifference."
Spruill v. Gillis, 372 F.3d 218, 236 (3rd Cir. 2004).  Sergeant Adams is an officer at
Holman prison, a non-medical prison official.  Based on Plaintiff's facts and the
grievances filed after Plaintiff's diabetic card was pulled (doc. 74 at 7-8), it is clear
that Sergeant Adams was following directions from the medical staff, when he
forced Plaintiff to return his diabetic card.  Additionally, there is no evidence to
suggest that Sergeant Adams had any reason to question the validity of the doctor's
order or to believe that Plaintiff was being mistreated by the medical staff.  Brent v
Ashley, 247 F.3d 1294, 1306 (11th Cir. 2001).  Therefore, Sergeant Adams did not
interfere with Plaintiff's medical treatment – he simply followed the prescribed
treatment.  Plaintiff has failed to state a valid claim against Defendant Sergeant
Adams, and this claim should be dismissed from the action.

    **D.**    **Eighth Amendment Violation for Failure to Train and Supervise**

Plaintiff alleges that Defendant Ruth Naglich, the medical director of nurses
in Montgomery, Alabama, failed to train and supervise the staff at Holman after
she was notified by letter that defendants were not providing him with diabetic
treatment and failed to take any action to remedy the situation.  Plaintiff's claim
fails for two reasons.  First, "[i]t is well established in this Circuit that supervisory
officials are not liable under § 1983 for the unconstitutional acts of their
subordinates on the basis of *respondeat superior* or vicarious liability." Cottone v.
Jenne, 326 F.3d 1352, 1360 (11th Cir. 2003) (citations omitted).

Instead, supervisory liability under § 1983 occurs either when the

> supervisor personally participates in the alleged unconstitutional conduct or when there is a causal connection between the actions of a supervising official and the alleged constitutional deprivation. <u>Gonzalez</u>, 325 F.3d at __, 2003 WL 1481583, at *5; Brown v. Crawford, 906 F.2d 667, 671 (11th Cir. 1990). The necessary causal connection can be established "when a history of widespread abuse puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he fails to do so." <u>Gonzalez</u>, 325 F.3d at __, 2003 WL 1481583, at *5 (quoting <u>Braddy v. Fla. Dept. of Labor & Employment</u>, 133 F.3d 797, 802 (11th Cir. 1998)); Brown, 906 F.2d at 671. Alternatively, the causal connection may be established when a supervisor's "'custom or policy . . . result[s] in deliberate indifference to constitutional rights'" or when facts support "an inference that the supervisor directed the subordinates to act unlawfully or knew that the subordinates would act unlawfully and failed to stop them from doing so." <u>Gonzalez</u>, 325 F.3d at __, 2003 WL 1481583, at *5 (quoting Rivas v. Freeman, 940 F.2d 1491, 1495 (11th Cir. 1991)); <u>Hartley</u>, 193 F.3d at 1263; <u>see also Post v. City of Ft. Lauderdale</u>, 7 F.3d 1552, 1560-61 (11th Cir. 1993). "The standard by which a supervisor is held liable in [his] individual capacity for the actions of a subordinate is extremely rigorous." <u>Gonzalez</u>, 325 F.3d at __, 2003 WL 1481583, at *4 (internal quotation marks and citation omitted).

<u>Cottone</u>, 326 F.3d 1352, 1360-61. Plaintiff does not allege any widespread abuse of the medical staff at Holman, instead he states facts specific to his condition. There is no identified policy or custom that would establish a casual connection between Defendant Naglich's conduct (or lack of conduct) and her alleged constitutional violations. Second, the Court has found no constitutional violation on the part of any defendant; therefore, Defendant Naglich cannot be secondarily liable, and this claim should be dismissed.

## V.    <u>Conclusion</u>

The allegations and controlling issues against the unserved defendants in this action are the same or similar to those whose motion for summary judgment is before the Court. It would be a futile gesture and an inefficient use of judicial

33

resources to conduct further proceedings against the unserved defendants when the record before the Court is conclusive as to the facts and prove Plaintiff has failed to state a claim against any named defendant and there is no genuine issue of material fact for trial. *See generally* 28 U.S.C. § 1915(e)(2)(B). Based on the foregoing, it is recommended that Defendants' motion for summary judgment be granted and that Plaintiff's entire action be dismissed.

## VI.    Notice of Right to File Objections

A copy of this report and recommendation shall be served on all parties in the manner provided by law. Any party who objects to this recommendation or anything in it must, within fourteen (14) days of the date of service of this document, file specific written objections with the Clerk of this Court. *See* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72(b); S.D. ALA. L.R. 72.4. In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's report and recommendation where the disputed determination is found. An objection that merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific.

**DONE** this the 27th day of December, 2013.


                    */s/ Katherine P. Nelson*
                    **KATHERINE P. NELSON**
                    **UNITED STATES MAGISTRATE JUDGE**